DREW, Justice
(dissenting).
I am unable to agree to the majority opinion. The able chancellor who heard and decided this case wrote the following able and exhaustive opinion which I hereby adopt as my views:
“On December 1, 1945, Ermine M. Owen-by, individually, Ermine M. Owenby, as ad-ministratrix d.b.n.c.t.a. of the estate of W. R. Ward, deceased, and as trustee of the real estate belonging to W. R. Ward at the time of his death, Carl L. Owenby, Annie Belle Lyle Malone, individually and Annie Belle Lyle Malone as Attorney in fact for James Lyle Malone, executed a deed to the City of Quincy, a municipal corporation. The conveyance was a gift. The granting clause of this deed is as follows: * * have bargained, granted and sold, and do, by these presents, bargain, grant, sell and convey unto the said party of the second part, its successors and assigns forever, for the purpose of being used by the party of the second part as a park, playground or for recreational purposes for white persons only, the following described property ‡ * ifc >
“After a description of a parcel of land consisting of one-half of a city block and the usual form of warranty, the deed continues :
*429 “ ‘And the party of the second part, by the acceptance of this deed, agrees that it will use said property for a park, playground or for recreational purposes for white persons only and agrees that the parties of the first part, their heirs or assigns may enjoin them from using said property for any other purpose.
“ ‘It is further understood and agreed between the parties hereto that in the event said property is not used for the purposes for which it is conveyed, as hereinabove set forth, within five years after date hereof, or should cease for a period of one year to be used for any of said purposes, that the said property shall revert to the parties of the first part, their heirs or assigns.’
“Stated chronologically, the facts developed by the evidence are briefly as follows:
“There is in the City of Quincy a vacant lot, approximately three hundred feet square, with paved streets on each side, and located in a highly developed residential section of the city just one-half block removed from the grounds of the local public school. A number of large trees stand along the streets bordering the block. The entire block is known locally and will herein be referred to as ‘Ward’s Lot.’ For many years prior to the execution of this deed above mentioned this property was not put to any commercial use by the owners except occasional renting to small circuses, tent shows and carnivals. During this period the children of the community in substantial numbers habitually used Ward’s lot as a place for play, and to some degree the property was used by the local school as a place for supervised recreation for school children during recess periods when the schools were in operation. This was done, apparently, without any express agreement with, but without any objection from, the owners of the property.
"In 1945 the plaintiffs owned one-half of Ward’s lot and the other half was owned by Randolph Jones et al. The city purchased that half of the lot owned by Jones et al., paying therefor some $4,500.00.
“Some time during the summer, or early fall of 1945 the city, acting through its then Mayor-Commissioner, James J. Love, began negotiations for the purchase of that half of Ward’s lot then owned by the plaintiffs. Most of these negotiations were conducted with the plaintiff, Carl L. Owenby. Almost immediately Col. Owenby suggested the possibility that the property might be donated to the City as a memorial to the late W. R. Ward, who had been a prominent citizen of the community, and his nephew, Arthur Malone, a brother of Mrs. Owenby, who had lost his life in the service of his Country during the Second World War. The evidence is lengthy, but not very definite as to just what was said in these negotiations. The parties discussed beautifying the area, planting flowers, building walkways, the construction of a bandstand, the erection of a memorial fountain or plaque (even to some extent the inscription to appear on the plaque) and the employment of a landscape gardener to assist in planning the work to be done. Mr. Love used the expression ‘a place of beauty’ and ‘something of which the family would be proud’ in discussing the plans of the city. The evidence clearly establishes that it was the intention of the city, as expressed by Mr. Love, and the intention of the grantors that the city would spend substantial money and energy in making Ward’s lot more beautiful or useful or both. It is impossible for the Court to glean from the evidence any meeting of the minds of the parties upon just what would be done. Perhaps the most specific statement is to be found in the testimony of Col. Owenby:
“ ‘A. I did not return from service until the latter part of September, that is, to Quincy in 1945. Prior to that time the only thing that I recall is the letter from Mr. Love, which I make this explanation to the counsel, if I might, that only after 3 frantic weeks was it discovered night before last at 10:30. I make that remark in apology to you and Mr. Towles because it w;as something that Mr. Love did not recall at the time. When I returned to Quincy, Mr. *430 Love, when his office was in the Wilson building over there, approached me and said that we had many conferences together but on this particular occasion he said that the Jones people, I believe Mr. Randolph and one of his brothers, had tendered the property to the City of Quincy not as a gift because they would not give anything, but that they had been tendered $4,500.00 for the east half of the Ward lot, and he, as the Mayor of the City of Quincy, tendered us the same amount, the consideration of $4,500.00 with the comment that he thought that the price was a little high but that since they had tendered Mr. Jones that, that he would tender the Ward estate the same amount. Mrs. Owenby was not present at that conference. Subsequent to that the matter was presented to Mrs. Owenby and Mrs. Malone but with only the casual observation that Mr. Love, who represented the City of Quincy at that time, that there was a possibility that the Ward estate would give the property to the City of Quincy under certain stipulated conditions. Among them were that the property would be improved and would be a “Thing of beauty”, that’s Mr. Love; that there would be parks and flowers and that it would be improved as rapidly as possible as soon as materials were available. In one of the conversations with Mr. Love there was a question of a bandshell on the northwest corner of this particular property which was 150 x 300 feet. No specific details were given in there but Mr. Love said that it was the intention of the City of Quincy to retain the services of a qualified landscape gardener or architect or whatever the professional qualifications were to put the property into such shape that it would be a thing of beauty and something that Mrs. Owenby and the estate of Arthur Malone and Mrs. Malone would be very proud of. No promises were made at this particular conference because I was not authorized by Mrs. Owenby as I was not the attorney for her estate but was merely, among other things, discussing it with Mr. Love. He approached me on it. I did not approach him. I did not offer to give the property. He tendered the $4,500.00, the same amount that Randolph Jones and his brother were tendered for the east half of the property. We did specifically go into the question at that time, or possibly at a later conference, the question of how many years would be required to do this. I recall in recent conversations this letter. No one else recalled it and when I found it, I noticed that there were 2 or 3 years mentioned in there, but the deed which was drawn, I believe by the then City Attorney, I’m not positive on this point, stipulated that it should be done within 5 years.
“ ‘Q. Why was a 5-year limitation put in the deed? A. Because it was necessary to get a priority from Washington at that time because it was shortly after a war and you had to get certificates of necessity for cement or for most any kind of building materials.
“‘Mr. Oven:
“ ‘Q. Was there any discussion between you and Mr. Love prior to the delivery of this deed with regard to the acquisition of playground equipment for this lot? A. Not to my knowledge, but it was to be used by the City of Quincy for a park to embrace the entire block, not the part given by the Ward estate but the entire block. He told me at the time that when it was suggested, and the suggestion came from me and not from Mr. Love, that I believed that possibly Mrs. Owenby and Mrs. Malone might consider donating the property to the City of Quincy provided certain stipulations were met; that I would approach them on the subject and obtain their comment.
“ ‘Q. Did you have a discussion with Mr. Love in regard to naming the park? A. We did; and at this juncture I might say that I have never discussed with any member of the City Commission prior to the delivery of this deed, except Mr. James J. Love, who stated at the time that he represented the City of Quincy as Mayor. *431 That was the general understanding. The question of the hospital, the question of any other extraneous reputation was never entered into, but Mr. Love did say that that would be fine to obtain it for a park, that the City did not have a park available, that in the event that the property was obtained for a minor or nominal consideration, that the City would be in a position to spend materially much more on it since they were acquiring it absolutely free of charge.
“ ‘Q. Was there any discussion in regard to naming it? A. Yes. Mr. Love said that he thought that the name of W. R. Ward and Arthur Random Malone, his nephew, deceased November 1944, that he thought that the name would be too long, would be cumbersome, but that the park would be appropriately marked and would be called the Arthur Random Malone Memorial Park.
“ ‘Q. Was there a discussion of the erection of a plaque? A. There was. It was agreed to by him and he, in fact, suggested it.
“ ‘Q. Was there a discussion of the construction of the walks? A. Yes.
“ ‘Q. What was the extent of that discussion? A. Only the extent that they said they would put the walks and the flowers in the parkways there and beautify it, as he said, “A thing of beauty”, which Mrs. Owenby and their family would be proud of ”.
“There is no evidence as to just what transpired in connection with the drafting, execution and delivery of the deed. Neither the scrivener, nor any witness to the deed was called to testify. No contemporaneous conversations were narrated. And the record does not disclose who instructed the scrivener as to the terms of the instrument he was to prepare.
“After the execution of the deed the city did nothing to the property except to discontinue its use for any commercial purpose, plant a small amount of grass, keep all the grass mowed, and expend some $2,077.20 in hauling in earth to fill parts of the lot which were so low that in times of very wet weather water accumulated and sometimes remained for a day or two. The use of the property by the children of the city as a place for play and recreation has continued and probably increased to some extent. The use of the property by the local school as a place for supervised exercise and recreation of school children under the direction of their teachers during school recesses has materially increased and the property is now, except for the filling done by the city, in much the same physical condition that it was when the deed was executed. The County School Board installed receptacles for trash on the property.
“The record shows also that the city at one time in 1953 made plans for and contemplated the construction of sidewalks and crosswalks on the lot, but the city was requested by the County School Board to refrain from making any changes in the property for the reason that the school plant did not have sufficient playground area in relation to the size of buildings and number of pupils to meet the requirements of state law, and it was only by using this property for school playgrounds that the county could get the maximum of state aid for the school. Acceding to this request, the city did nothing more to the property. No playground equipment of any sort has been placed on the property, but the testimony of the school authorities discloses that they preferred that this not be done as, in their opinion, it tended to discourage organized games which they considered preferable for the children.
“In the light of the foregoing facts, the Court has the duty of determining whether or not the relief prayed for should be granted. In doing this the Court is bound by established rules of law and principles of equity which it is powerless to change and which it is duty bound to apply to the facts developed by the evidence.
*432 “The Court will first consider the prayer for a reformation of the deed. The plaintiff’s contention is that by an error of the scrivener the word ‘or’ was used in the place of the word ‘and’ so as to produce an alternative instead of a conjunctive relationship between the words ‘park’, ‘playground’ and ‘recreational purposes,’ in referring to the uses to which the property was acquired to be put.
“It is apparent from an examination of the deed that this mistake, if one occurred, was not a mere inadvertence. The phrase ‘a park, playground or for recreational purposes’ appear in the granting clause preceeding the description of the land and again in a paragraph following the warranty and preceeding the paragraph providing for the reversion. It will be noted also that the reversion clause provides that ‘should (the property) cease for a period of one year to be used for ‘any of said purposes’ the reversion should take place. It is thus made clear that the sc/trivener, who must be presumed to have a working knowledge of the English language, intended the use of the alternative and intended to provide for a reversion only in the event of a failure on the part of the city to use the property for any of the purposes specified. The conclusion is inescapable that the scrivener wrote what he intended to express and the error, if any, was in a misunderstanding of the instructions given to him.
“But this alone does not solve the problem. If the scrivener misunderstood the intentions of the parties and wrote the instrument in such a way as to express something different from the contract which he had been directed to reduce to writing, a reformation may still be decree [sic] if the necessary proof is present.
“However, in order to secure a reformation, the plaintiffs must show by clear and convincing proof that the minds of the parties met on a clear, definite and specific agreement; that it was the intention of the parties to reduce this agreement to writing; that the grantor in executing and the grantee in accepting the deed intended and actually believed that the instrument delivered expressed the contract upon which their minds had met.
“Turning now to the testimony, it is evident that the Mayor-Commissioner with whom Col. Owenby discussed the transaction on several occasions contemplated that the city would beautify the property to a substantial degree and that Col. Owenby entertained the same idea during these conversations. There is no showing that any definite agreement was reached as to the nature and extent of this beautification. A bandstand was discussed. The erection of a plaque was discussed. General terms such as making the property ‘a thing of beauty’ and something of which the grantors ‘would be proud’ were rather freely used. But property may be donated to a City with the intention of the grantor and grantee that certain things will be done under at least three different legal situations: (1) the grantors may rely entirely upon the good faith of the city to carry out its expressed intentions, (2) the grant may be subject to a covenant enforceable by the grantors, or (3) the conveyance may contain a reversion clause divesting the city’s title if specified conditions are not complied with.
“The question with which the Court is confronted is this — does the evidence establish by clear and convincing proof which, if any, of these were agreed upon between the parties? To answer this question we cannot look to the deed because the contention is that the deed did not truthfully reflect the intention of the parties — did not express in writing that upon which the minds of the parties had met.
“It is readily ascertainable from the evidence that the grantors did not intend to rely solely upon the expressed intention of the city as to the use to which the property would be put. The testimony of Col. Owenby is uncontradicted that the deed would be made upon some conditions, al *433 though the exact nature of these conditions is not made clear. But whether the conditions would be in the nature of conditions precedent, restrictions, covenants or provisions for reversion cannot be ascertained from his or any other testimony in the case.
“In many of the legal writings a distinction is drawn between covenants, restrictions, and conditions and in a strict legal sense it is improper to refer to a condition in a grant unless it is a condition precedent, performance of which must precede the vesting of title or a .condition subsequent, the occurrence of which will terminate the estate granted and effect a reversion.
“If we adopt the strict legal definition of the word ‘conditions’ as used in the testimony — and this may be proper since Col. Owenby is a lawyer — it is still uncertain whether he referred to conditions precedent or conditions subsequent. It cannot be said with any assurance upon which the minds of the parties met. But even if we go further and reach the conclusion that the minds of the parties did reach an agreement that the conveyance would be made subject to some conditions subsequent, from the testimony what would these conditions be? There is testimony that the property would be made ‘a thing of beauty’, or something of which the grantors would ‘be proud’. There is also testimony with respect to the erection of a bandstand, and a plaque or drinking fountain. There were references to planting flowers, landscaping, the construction of walks. There was reference to a park and playground. Were all of these to be required of the city? If not, which of them did the minds of the parties meet upon as the conditions subsequent to be included in the deed? The Court cannot say that the evidence is clear and convincing that the parties agreed upon any definite and specific conditions subsequent to be incorporated in the deed. Certainly it cannot be said that the parties agreed that a park tmd playground would be established. From the evidence the Court is convinced that had the city built an attractive bandstand, constructed sidewalks and crosswalks, erected a plaque with suitable inscription, planted shrubbery and flowers and carefully tended and cultivated them, the grantors would not be dissatisfied or assert that a reversion had occurred. But had the city done all this, and utilized all of the property for these purposes, there would then be no playground and the terms of the phrase ‘park and playground’ would have been equally violated.
“Turning again to the deed itself it is observed that there is no evidence as to just what transpired in connection with the instructions to the scrivener, the drafting, execution, delivery and acceptance of the deed. The limitation of the use of the property to white persons, the term of five years allowed to begin the required uses, and the term of one year of abandonment as affecting a reversion were not mentioned in the negotiations. Where did these come from? Of particular significance is the fact that use of the property for forbidden purposes is not to work a reversion, but merely give rise to a right to enjoin such misuse whereas failure to use the property for any of the required purposes does work a reversion. Obviously someone, presumably one or more of the parties, gave the necessary instructions to the person who drafted the deed. One of the grantors is a lawyer, the head of a large and successful business, a man whose keen intellect is apparent from his testimony. He signed and delivered the deed.
“Under all these circumstances,' the sanctity which the law gives to written contracts, particularly muniments of title to land, has not been overcome by the evidence and reformation of the deed must be denied.
“Turning to the proper construction of the deed as written, giving full force to the use of the alternative word ‘or’ in the phrase under consideration the Court finds that the property in question has been used *434 for ‘playground’ purposes and there has been no reversion to the former owners.
“Careful consideration has been given to the contention that the word ‘or’ should be construed as ‘and’ but the Court is of the opinion that this is permissible only when necessary to give effect to the intention of the parties as drawn from the instrument in the light of the circumstances under which it was executed- Such a construction in this case would do violence to the obvious intent of the instrument as drawn.
“As above stated, it was the intention of the city, as expressed by its Mayor-Commissioner, to improve the property to a substantial degree and particularly to make it more beautiful. This idea was also present in the minds of the grantors. It motivated the gift. The fact that the deed was so drafted that this was not a legal duty of the city, impels the Court to deny the relief sought in this proceeding. The extent of any moral obligation on the city, and its present officials, to carry out the intentions expressed in the negotiations leading up to the gift of valuable property to the city is a matter not within the scope of judicial determination. Nothing in this decree should be construed as a finding that such moral obligation does not exist.
“It is suggested by the city that Mr. Love, the Mayor-Commissioner, acted in a personal and individual capacity in discussing the acquisition of this property with the former owners and that nothing he said should be regarded as being binding upon the city. When the city accepted the gift of the property as fruits of Mr. Love’s activities it ratified all that he had done and said that could reasonably have been considered by the persons with whom he dealt as having been done with the authority of the city.
“It is, therefore,
“Considered, ordered, adjudged, and decreed by the Court that the complaint filed herein be and the same is hereby dismissed upon its merits.”
I am authorized to say that Mr. Chief Justice TERRELL and Mr. Justice THORNAL concur in this dissent.